UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                   :

JOHN PETRUCELLI, *pro se*,           :

                                   :

          Plaintiff,          :          **<u>Opinion and Order</u>**

                                   :

          -against-        :          05-cv-2002 (DLI)(LB)

                                   :

Warden DENNIS W. HASTY, TODD BAILEY, :
Lieutenant DANIEL ORTIZ, Captain S.     :
LoPRESTI, and Lieutenant W. MORAN.     :

                                   :

          Defendants.      :

                                   :
------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

       Plaintiff John Anthony Petrucelli, a federal prisoner, brought this *pro se* action under

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1970),

against five current and former employees of the Federal Bureau of Prisons ("BOP") at the

Metropolitan Detention Center in Brooklyn, New York ("MDC").[1] He alleges that Dennis W.

Hasty, a former MDC warden, Todd Bailey, a former MDC Legal Counsel, Salvatore LoPresti, a

former Captain, and Lieutenants Daniel Ortiz and William Moran (collectively "defendants")

violated his due process rights under the Fifth Amendment by wrongfully detaining him for 180

days in the Special Housing Unit ("SHU") of the MDC. Defendants move to dismiss all claims

pursuant to Fed. R. Civ. P. 12, and alternatively, for summary judgment pursuant to Fed. R. Civ.

P. 56(b). For the reasons set forth below, the court grants the motion to dismiss because Petrucelli

did not exhaust his administrative remedies as is required under the Prison Litigation Reform Act

("PLRA") for him to file a *Bivens* claim. Furthermore, even if Petrucelli satisfied the PLRA's

exhaustion requirements, the court finds no issue of material fact that would require a trial, and therefore, would grant summary judgment in favor of defendants.

## I.     Factual Background

The following facts are undisputed, and unless otherwise noted, are presented in the light most favorable to Petrucelli.  In late January 2002, the Federal Bureau of Investigation ("FBI") arrested Petrucelli, and he was held at the MDC in Brooklyn while awaiting trial for murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1)(2000).  (Defs.' Rule 56.1 Statement ¶¶ 2 & 11; Ex. A to Dannels Decl.)  He was convicted of the offense on February 7, 2003 in the United States District Court for the Southern District of the New York, and sentenced to life imprisonment, which he is now serving. (Defs.' Rule 56.1 Statement ¶ 5.)  During the first six months of his pretrial detention at the MDC from January 31 to July 30, 2002, Petrucelli was placed in administrative detention and housed separately from the general population.[2]  This *Bivens* action concerns this period of solitary confinement.

During his intake screening at the MDC on January 31, 2002, Petrucelli was not cleared for housing in the general population because the FBI had reported to the BOP that he was a "murder suspect and should be considered high security."  (Dannels Decl. ¶ 5.)  He was designated for

---

[1]     When a federal officer violates a person's constitutional rights, *Bivens* permits that person to recover monetary damages even if there is no statute specifically conferring such a cause of action.  *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994).

[2]     Petrucelli unsuccessfully attempts to create a minor issue of disputed fact by claiming that he was taken to the MDC on January 28 instead of January 31, 2002.  While the precise time of Petrucelli's arrest pursuant to the arrest warrant issued on January 28, 2002 is not conclusively established in the record, there is no doubt that he was taken to the MDC on January 31, 2002 based on the MDC records cited by defendants in their motion papers and plaintiff's original and second amended complaints.  (Defs.' Rule 56.1 Statement ¶ 2; Dannels Decl. ¶ 3, Exs. A, B; Compl. ¶ 10; Second Am. Compl. ¶¶ 3, 6.)  Moreover, plaintiff's affidavits in opposition to defendants' motion do not dispute the MDC records, which clearly show that he was admitted to the MDC on January 31, 2002.

administrative detention and placed in the SHU at the MDC because of the nature of the charges pending against him, as well as the FBI report. (Defs.' Rule 56.1 Statement ¶¶ 11 & 12; Exs. A & B to Dannels Decl.) On February 1, 2002, Moran prepared an administrative detention order authorizing the SHU placement, and Petrucelli received a copy of the order on the same day. (Defs.' Rule 56.1 Statement ¶¶ 12 & 13; Dannels Decl. ¶ 6 & Ex. C.)

On February 4, 2002, within three days of Petrucelli's placement in administrative detention, Ortiz conducted a record review and concluded that Petrucelli should continue in the SHU. (Defs.' Rule 56.1 Statement ¶ 14; Ex. D to Dannels Decl.) On February 8, 2002, Petrucelli appeared before LoPresti for a formal review of Petrucelli's placement in administrative detention, and LoPresti also continued Petrucelli's placement in the SHU. (Defs.' Rule 56.1 Statement ¶ 15; Ex. D to Dannels Decl.) Throughout Petrucelli's placement in administrative detention, BOP personnel conducted weekly record reviews and monthly formal reviews of Petrucelli's administrative detention status pursuant to BOP Program Statement 5270.07 and as is required by 28 C.F.R § 541.22. (Ex. D to Dannels Decl.) Beginning March 1, 2002, the BOP also held monthly psychological reviews of Petrucelli while he was in the SHU pursuant to the same rules and regulations. (Ex. E to Dannels Decl.) These psychological reviews all concluded that his risk of self-harm and potential harm to others was "low." On July 30, 2002, Petrucelli was released from the SHU and housed with the general population. (Defs.' Rule 56.1 Statement ¶ 51; Dannels Decl. ¶ 40 & Ex. N.)

During his time in administrative detention, Petrucelli made formal and informal complaints about his placement there. On April 1, 2002, two months into his administrative detention, Petrucelli applied to be released into the general population before the trial judge, the Hon. Thomas P. Griesa. (*See* Pl.'s Criminal Docket, *United States v. Petrucelli*, No. 02-cr-99

(TPG) (S.D.N.Y. filed Jan. 31, 2002, term. Feb. 10, 2003) (Apr. 1, 2002 Pretrial Conference).) At a court conference that day, the MDC explained that Warden Hasty made the decision to place Petrucelli in the SHU based on the nature of the murder racketeering charge, the possibility of capital punishment in the case, and Hasty's 30 years of correctional experience. (Tr. of April 1, 2002 Conference ("Tr."), Ex. A to Pl.'s Rule 56.1 Statement.) The placement was characterized as a "preemptive measure" though not all of Petrucelli's co-defendants were placed in administrative detention. (Tr. at 5, 8.) The prosecution took no position on his housing placement other than to express support for the BOP's procedures for the handling of such situations, and related that the U.S. Attorney's office was still deciding whether to seek the death penalty in the case. (Tr. at 7.) The BOP indicated that Petrucelli had recourse to seek administrative remedies internally through the prison, but none had been filed. (Tr. at 5.) Petrucelli's attorney countered that his client had never previously been incarcerated and tried to seek remedies three weeks before but was not given the proper form. (Tr. at 7, 15.) Judge Griesa ordered Petrucelli to seek the administrative remedies before making a formal motion with the court. No motion was subsequently filed with the trial court concerning Petrucelli's administrative detention.

On April 3, 2002, Petrucelli filed a BP-9 grievance with the Legal Department at the MDC requesting that he be released from the SHU into the general population. (Defs.' Rule 56.1 Statement ¶ 52; Ex. I to Dannels Decl. at 002.) Hasty denied this request on April 11, 2002. (Defs.' Rule 56.1 Statement ¶ 53; Ex. I to Dannels Decl. at 002.) On April 15, 2002, Petrucelli submitted a BP-10 appeal to the Northeast Regional Office appealing Hasty's decision, and, upon being notified that he had not included the required documentation with his submission, resubmitted his corrected appeal on April 29, 2002. (Defs.' Rule 56.1 Statement ¶¶ 54, 55, & 57; Ex. I to Dannels Decl. at 003 & 004.) The regional office denied Petrucelli's appeal on May 28,

2002. (Defs.' Rule 56.1 Statement ¶ 58; Ex. I to Dannels Decl. at 004.) Petrucelli claims in his second amended complaint that he appealed this decision to the BOP Central Office Appeals in Washington, D.C. on June 2, 2002, but the BOP has no record of this appeal (Second Am. Compl. ¶ 11; Defs.' Rule 56.1 Statement ¶ 59.) On July 30, 2002, Petrucelli was released from the SHU into the general population. He claims that LoPresti told him that he was being released because the MDC received notice from Washington, D.C. that Petrucelli was no longer facing the death penalty. (Petrucelli Decl. ¶ 11.)

After he was convicted and sentenced, Petrucelli again attempted to exhaust his administrative remedies and challenged his pretrial administrative detention with a BP-9 filed on September 30, 2004. (Defs.' Rule 56.1 Statement ¶ 60.) This initiated another chain of administrative grievances which eventually reached the BOP Central Office Appeals in Washington, D.C. (*Id.* ¶¶ 60-70.) The grievance was denied as untimely at the national level on February 15, 2005. (*Id.* ¶ 70.) Petrucelli filed this action on April 25, 2005.

## II.    Standards of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to make a motion to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion for judgment on the pleadings pursuant to Rule 12(c) is evaluated using the same standard as a motion under Rule 12(b)(6). *King v. Am. Airlines, Inc.*, 284 F.3d 352, 356 (2d Cir. 2002). In *Bell Atlantic Corp. v. Twombly*, the Supreme Court retired the standard set forth half a century ago in *Conley v. Gibson*, that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," in favor of the requirement that plaintiff plead enough facts to "state a claim to relief that is plausible on its face." *Twombly*, 127 S. Ct. 1955, 1968-69, 1974 (2007)

(quoting *Conley*, 355 U.S. 41, 45-46 (1957)). Under *Twombly*, a complaint cannot make merely "a formulaic recitation of the elements of a cause of action," but must allege facts that "raise a right to relief above the speculative level on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (citations omitted). The Second Circuit has interpreted the foregoing language to "requir[e] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*," rather than to mandate a "universal standard of heightened fact pleading." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis added).

Summary judgment under Rule 56(c) is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 1776 (2007). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), but must affirmatively "set out specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e)(2). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Harris*, 127 S. Ct. at 1776. "When no rational jury could find in favor of the nonmoving party because the evidence

to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

Under the local rules of this district court, a party moving for summary judgment must provide a Local Rule 56.1 Statement, which is a "short and concise statement, in numbered paragraphs [listing] the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rules of the United States Districts for the Southern and Eastern Districts of New York ("Local Rules") 56.1(a). The party opposing the motion for summary judgment must answer with a Local Rule 56.1 Counterstatement, setting forth in "correspondingly numbered paragraph[s] responding to each numbered paragraph in the [moving party's Rule 56.1 Statement], and if necessary, [in] additional paragraphs," the material facts "as to which it is contended that there exists a genuine issue to be tried." Local Rule 56.1(b). Each numbered paragraph in the moving party's Rule 56.1 Statement will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the opposing party's Rule 56.1 Counterstatement. Local Rule 56.1(c). To ensure that *pro se* parties are informed of and comply with these provisions, the local rules require represented parties moving for summary judgment to give a notice to the *pro se* litigant on the proper way to respond. Local Rule 56.2.

In this case, defendants served their Local Rule 56.1 Statement on the plaintiff and gave him a Local Rule 56.2 notice on how he must comply with Fed. Civ. P. 56(e) and Local Rule 56.1. Petrucelli did not respond to defendants' Rule 56.1 Statement in correspondingly numbered paragraphs, but instead supplied two additional statements setting forth his own factual contentions. To the extent the facts in defendants' Rule 56.1 statement are not directly addressed by Petrucelli, they are deemed undisputed for the purpose of the summary judgment motion.

In addition to viewing the facts in the light most favorable to the non-moving party, the court liberally reviews *pro se* submissions to raise the strongest arguments that they suggest. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal citations and quotation marks omitted).

## III. Discussion

### A. Statute of Limitations

Defendants argue that Petrucelli's *Bivens* claim must be dismissed because it is time-barred under the applicable statute of limitations found in § 214(5) of the New York Civil Practice Law and Rules, which states that an action to recover damages for personal injury must be commenced within three years. N.Y. C.P.L.R. § 214(5); *Chin v. Bowen*, 833 F.2d 21, 23 (2d Cir. 1987). While federal courts look to state law to determine the limitations period applicable to a *Bivens* claim, federal law determines the time in which a federal claim accrues. *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994). A *Bivens* claim accrues and the limitations period begins "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995) (citations omitted). This action was filed on April 25, 2005, more than three years after Petrucelli was placed into SHU on January 31, 2002. In arguing that Petrucelli's *Bivens* claim must be dismissed as untimely, the government asserts that Petrucelli knew of the alleged wrongful nature of his administrative detention as soon as he was placed in the SHU and that the limitations period includes the time when his administrative claims were pending. (Defs.' Mem. of Law at 11.) The court disagrees with the first assertion on the facts, which will be addressed in § III.B.1 *infra*, and the second assertion as a matter of law.

The Second Circuit has had no occasion to decide whether the pendency of administrative

claims brought by an inmate plaintiff tolls the statute of limitations for a *Bivens* suit. *See Bourguignon v. Armstrong*, No. 3:06-cv-0259(WIG), 2007 WL 2495230, at *3 (D. Conn. Aug. 28, 2007) (citing *Sims v. Goord*, 151 F. App'x. 12, 14 (2d Cir. 2005)). The Tenth Circuit found that "[e]very circuit to address the issue has held that the filing of a mandatory administrative grievance tolls the statute of limitations for § 1983 and *Bivens* claims." *Roberts v. Barreras*, 109 F. App'x. 224, 226 (10th Cir. 2004) (citing *Leal v. Georgia Dep't. of Corrections*, 254 F.3d 1276, 1280 (11th Cir. 2001) (citing other circuit decisions)). Given the absence of controlling Second Circuit law on this issue and the posture of the other circuits, the court will toll the statute of limitations for this *Bivens* action. *See also Allaway v. McGinnis*, 362 F. Supp. 2d 390, 393-94 (W.D.N.Y. 2005) (tolling the statute of limitations during the pendency of inmate plaintiff's administrative appeals); *Hayes v. Dep't of Corrections Officers*, No. 97 Civ. 7383 (MBM), 1998 WL 901730, at *6 (S.D.N.Y. Dec. 28, 1998) (noting that, if plaintiff had pursued administrative remedies after the effective date of the Prison Litigation Reform Act ("PLRA"), the statute of limitations would have been tolled under New York law permitting tolling where there is a statutory prohibition to filing suit). The court finds that Petrucelli filed this action within the three-year statute of limitations because the period during which he sought administrative remedies is tolled.

### B.       Exhaustion of Administrative Remedies

Defendants also argue that the Petrucelli's claim is barred by the PLRA because he never exhausted his administrative remedies. The PLRA provides that "no action shall be brought with respect to prison conditions under section 1983 . . .  or any other Federal law, by a prisoner confined in any jail, prison, or any other correctional facility until such administrative remedies as

are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement applies to *Bivens* claims. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002). Moreover, "filing an untimely or otherwise procedurally defective administrative grievance or appeal" does not satisfy the PLRA's exhaustion requirement. *See Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006). Courts must construe the exhaustion requirement strictly because "[a] prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction" and "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." *Id*. at 95. In the wake of *Woodford*, an inmate can no longer claim that partial exhaustion of administrative remedies is sufficient because prison officials have notice of his claim. *Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (overruling *Braham v. Clancy*, 425 F.3d 177, 183 (2d Cir. 2005)).

The BOP has established a four-step administrative-remedies process that federal inmates must follow to meet the PLRA's exhaustion requirement. First, an inmate must informally present an issue of concern to the staff, who shall then attempt to resolve the issue before that inmate submits a Request for Administrative Remedy. 28 C.F.R. § 542.13(a). Second, if the inmate is dissatisfied with the informal resolution of his issue of concern, the inmate must submit a formal written Administrative Remedy Request on a BP-9 form 20 calendar days following the date on which the basis for a remedy request occurred. 28 C.F.R. § 542.14(a). Third, an inmate who is not satisfied with the warden's response may submit an appeal on a BP-10 form to the Regional Director within 20 calendar days of the date of the warden's signed response. 28 C.F.R. § 542.15. Fourth, an inmate who is not satisfied with the Regional Director's response may submit a final appeal on a BP-11 form to the General Counsel at the Central Office of Appeals within 30 calendar days of the Regional Director's signed response. *Id.* The inmate must use the appropriate forms,

which are obtained from the prison staff. 28 C.F.R. §§ 542.14(c), 542.15(b). Finally, the process permits extensions of the time limits when the inmate demonstrates a valid reason for the delay. 28 C.F.R. § 542.15.

In this case, defendants assert that Petrucelli's initial request for administrative remedy in April 2002 was both untimely and incomplete, and that his second attempt, begun in September 2004, was also untimely. After carefully examining the record, the court finds that plaintiff may be excused for having initiated the administrative remedy process more than 20 days after he was initially placed in the SHU, but agrees with defendants on the latter points. There is no compelling evidence that Petrucelli ever fully exhausted his administrative remedies in his first attempt and that his second effort, beginning in September 2004 was out of time. Therefore, Petrucelli failed to timely exhaust his administrative remedies as required by the PLRA, and his action under *Bivens* is foreclosed.

### 1. Plaintiff's timely initiation of administrative remedies in April 2002

Petrucelli was placed in the SHU on February 1, 2002, and did not make his initial remedy request until more than 40 days later on April 3, 2002. (Defs.' 56.1 Statement ¶¶ 3-4, 52; Pl. Mem. at 6.) Petrucelli claims that he did not receive an explanation as to why he was housed in the SHU until April 1, 2002, and that he first received the appropriate remedy request forms on April 3, 2002. (Pl. Mem. at 6.) Defendants insist that he ought to have known the reason for his SHU placement from the outset because he signed an intake screening form and received the administrative detention order, both of which state the reason for his SHU confinement. (Defs.' Mem. at 8.) The record, however, supports Petrucelli's contention as neither document convincingly demonstrates that the reason for his placement in the SHU was conveyed to him.

The BOP intake screening form, dated January 31, 2002, indicates that Petrucelli was

interviewed at 10:00 p.m. at the MDC and answered a number of questions about his background. (Dannels Decl. ¶ 5, Ex. B.) He signed the middle portion of the form acknowledging his receipt of a BOP orientation booklet which specifies his rights and the prison's prohibited acts. Underneath his signature, in a section entitled "STAFF CHECKLIST," the question OK for general population is checked and then crossed out with NO checked next to it. Handwritten notes in the bottom margin indicate that the FBI reported the inmate as a murder suspect and should therefore be considered high security. The layout of the form shows that the information at the bottom was completed by the staff. Petrucelli's signature acknowledges only his receipt of the orientation booklet. There is no indication that he was informed of the reasons why his original designation for the general population was changed to administrative detention. Another pretrial interview form, also dated January 31, 2002, indicates that Petrucelli's name had been mentioned in newspapers in connection with his charged offense and that the manager recommended designating him for administrative detention status "per FBI's High Security" classification. (*Id.*) There is no signature on that review form and no indication that its contents were shared with Petrucelli when he was placed in the SHU.

Petrucelli was given a copy of his administrative detention order within 24 hours of his placement in the SHU. The detention order, created by Moran on a standard BOP form, lists seven standard reasons under the regulations that provide for administrative detention in compliance with 28 C.F.R. § 541.22(a). (Dannels Decl. ¶ 6, Ex. C.) The warden or his designee may "place an inmate in administrative detention when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution and when the inmate:

> (1) Is pending a hearing for a violation of Bureau regulations;
> (2) Is pending an investigation of a violation of Bureau regulations;
> (3) Is pending investigation or trial for a criminal act;
> (4) Is pending transfer;
> (5) Requests admission to administrative detention for the inmate's own protection, or staff determines that admission to or continuation in administrative detention is necessary for the inmate's own protection . . . ; or
> (6) Is terminating confinement in disciplinary segregation and placement in general population is not prudent. The Segregation Review Official is to advise the inmate of this determination and the reasons for such action.

28 C.F.R. § 541.22(a). In addition, the detention order form also lists as an option, the placement of an inmate in administrative detention pending the classification or reclassification of that inmate's confinement status. (*See* Dannels Decl. Ex. C.)

Only the second reason is checked on Petrucelli's detention order. It says that he was placed in administrative detention "pending investigation of a violation of Bureau regulations." This designation is curious because Petrucelli had just been placed in BOP custody and had not violated any prison rules. It is likely that Moran intended to check the third reason: that Petrucelli was meant to be held in the SHU pending trial for a criminal act. The error in the paperwork no doubt left the plaintiff confused about his SHU placement. Moran's comments at the bottom of the detention order also do not shed any more detail as to the reason for his SHU detention. It simply

states, "YOU ARE BEING PLACED IN ADMINISTRATIVE DETENTION FOR [sic] PENDING CAPTAIN REVIEW." (Ex. C to Dannels Decl.)

This comment suggests that Petrucelli's placement in the SHU was temporary pending Captain LoPresti's formal review, which occurred a week later on February 8, 2002. LoPresti prepared a special housing review form, but did not give a copy of the review form to Petrucelli. The review form asks the reviewing official whether the inmate received a copy of the staff's decision and if not, to explain why not. The form instructs that the inmate should be given a copy of the form, provided that institutional security is not compromised. Rather than answering the question "yes" or "no," LoPresti simply wrote "N/A [(Not Applicable)]" underneath the question. Petrucelli did not receive a copy of the special housing review form until the next such monthly review on March 3, 2002. On that day, LoPresti also created a memorandum to Petrucelli informing him that he was housed in administrative detention because of his status as "High Security due to your Death Penalty Case." (Ex. C to Dannels Decl.)

From this record review, it appears that Petrucelli did not receive the written reason for his placement in the SHU until more than a month after he was housed there. Without knowing the MDC's reason for placing him in the SHU, it would have been difficult for Petrucelli to understand the propriety of his SHU confinement and challenge its alleged wrongfulness. *Cf. Pinaud*, 52 F.3d at 1157 (stating that, when there is evidence of concealment of the alleged wrong by the defendant, "the time [limit of the statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.") (citation omitted). Thus, it was only after receiving the March 3, 2002 memorandum from LoPresti that Petrucelli was able to contest the reason for his confinement. On April 1, 2002, the trial judge sorted out the apparent difficulty in providing the remedy forms to Petrucelli and paved the way

for him to begin the administrative remedy process. Given the belated written notice to Petrucelli of the reason for his confinement and the subsequent delay in providing him the necessary complaint forms, the court finds that his initial administrative complaint was timely filed.

### 2. Plaintiff's failure to fully exhaust administrative remedies

Plaintiff never exhausted his administrative remedies, however. After the regional office denied his remedy request on May 28, 2002, plaintiff did not appeal to the national appeals office. Petrucelli claims that he submitted his final appeal to the BOP Central Office Appeals in Washington, D.C. on June 2, 2002. In an effort to explain why the Central Office did not receive his final appeal, plaintiff suggests that the BOP either inadvertently or intentionally failed to mail his final appeal. (Second Am. Compl. ¶¶ 11-13.) However, he has not provided any evidence to support this claim.[3] There is no copy of the BP-11 appeal that he allegedly mailed or any follow-up correspondence with the BOP. He does not indicate when and how he was informed that the Central Office Appeals had no appeal from him. The next time plaintiff used the BOP administrative-remedies process was two years later, in September 2004, when he untimely initiated a second round of grievance proceedings. It is apparent from the undisputed facts that plaintiff never completed the final step of the administrative-remedies process. The only question that remains is whether his claimed attempt to exhaust his remedies can excuse his non-exhaustion.

The Second Circuit has established a three-part inquiry when "a prisoner plaintiff plausibly

seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies" *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). First, "the court must ask whether administrative remedies were in fact 'available.'" *Id.* Second, the court "should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Finally,

> [i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

*Id.*

Here, there is no dispute that the final step of the administrative-remedies process was available to Petrucelli, who understood the exhaustion procedures. Defendants have raised this affirmative defense and there is no evidence that they tried to prevent him from completing the final step of his administrative-remedies request or otherwise threatened or deterred him. Nor does his situation qualify as a "special circumstance." According to *Hemphill*, there are "some circumstances [that] may render seemingly accessible remedies, in fact, unavailable." 380 F.3d at 688. In *Hemphill*, the inmate plaintiff reasonably interpreted prison regulations to permit him to

---

[3]    Attached to Petrucelli's first amended complaint are a number of letters, including a self-styled affidavit by one Larry Bronson, Esq., stating that he mailed Petrucelli's letter of complaint to the "Washington National Board in 2002." (Bronson Aff., dated Oct. 7, 2004, attached as Ex. C to Am. Compl.) The affiant does not state who he is or the basis of his knowledge. From the date on the document, it appears to have been produced some time after Petrucelli initiated his second round of administrative grievances in September 2004. Neither side refers to this document in their filings.

bypass the regular administrative-remedies process, which was controlled by the prison guards who allegedly beat and made threats against him. *See also Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (finding that an inmate's reasonable misunderstanding of the grievance procedures may be a 'special circumstance' justifying the inmate's failure to comply with the exhaustion requirement). Here, there is no reasonable misunderstanding of the exhaustion procedures, and there are no threats to render the remedies functionally unavailable. Petrucelli is not excused from failing to complete the final step of the administrative remedies, which was available to him. *See*, *e.g.*, *Boddie v. Bradley*, 228 F. App'x. 5, 7 (2d Cir. 2006) (mailing grievance to incorrect state agency is not a special circumstance excusing exhaustion); *Newman v. Duncan*, No. 04-CV-395 (TJM/DRH), 2007 WL 2847304, at *4 (N.D.N.Y. Sept. 26, 2007) (failing to exhaust remedies due to claimed but undocumented mental illness is not a special circumstance).

Even if the court assumes that Petrucelli somehow exhausted his administrative remedies, his *Bivens* claim still fails on the merits.

### C. Due Process Claims

Petrucelli's *Bivens* claim alleging that his pretrial SHU detention violated his Fifth Amendment due process rights can be divided into two claims: (1) a procedural due process claim asserting that the defendants failed to follow adequate procedures protecting his right to be free from unnecessary SHU detention, and (2) a substantive due process claim contending that the conditions of his confinement in SHU were punitive in nature and therefore violated his fundamental right as a pretrial detainee to be free from punishment. The record shows that defendants substantially complied with prison regulations. Even if they had not, defendants are still protected by qualified immunity on the procedural due process question. The court also finds no evidence of punitive intent on the part of defendants whose treatment of plaintiff appears to be

17

reasonably related to the warden's legitimate penological objective of maintaining a safe prison facility.

### 1. Procedural Due Process

Prison officials must be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 521 (1979). The warden's authority to place pretrial inmates in administrative detention is set forth in 28 C.F.R. § 541.22, and implemented through BOP Program Statement 5270.07 ("P.S. 5270.07").[4] Administrative detention "is a non-punitive status in which restricted conditions of confinement are required only to ensure the safety of inmates or others, the protection of property, or the security or orderly running of the institution." P.S. 5270.07, Ch. 9. The Program Statement closely tracks the language from 28 C.F.R. § 541.22 in setting forth the non-punitive reasons for placing an inmate in administrative detention, *see* n.3 *supra*, and outlining the review process to reassess the retention of the inmates confined in administrative detention.

Within 24 hours of placing an inmate in administrative detention, the warden or a designated Segregation Review Officer ("SRO") is required to "prepare an administrative detention order detailing the reasons for . . . [the] administrative detention" and, security circumstances permitting, deliver a copy to the inmate. 28 C.F.R. § 541.22(b); P.S. 5270.07, Ch. 9, Pg. 8, ¶ 1.b. Within three work days of the inmate's placement in administrative detention, the SRO must conduct a record review (in the inmate's absence) of the inmate's status and must continue with such a record reviews on a weekly basis. 28 C.F.R. § 541.22(c); P.S. 5270.07, Ch.

18

9, Pg. 8A, ¶ 1.c.(1). The SRO also must hold a formal review of the inmate's status with the inmate present and continue to hold such hearings at least once every 30 days. *Id*. The presence of the inmate at the formal review hearing is required unless the inmate waives his or her presence. *Id*. If there are no security concerns, the inmate must receive a copy of the SRO's decision stating the basis for the SRO's finding. *Id*. Finally, when the administrative detention continues beyond 30 days, BOP staff must conduct monthly psychiatric or psychological assessments of the inmate, including a personal interview, and produce a written report. *Id*.

As for the duration of the detention, the rules and regulations state generally that "administrative detention is to be used only for short periods of time except where an inmate needs long-term protection, or where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns." 28 C.F.R. § 541.22(c); P.S. 5270.07, Ch. 9, Pg. 8A, ¶ 1.c.(1). Except for inmates who are kept in administrative detention following the completion of a period of disciplinary detention in the SHU, the rules and regulations do not impose definite durational limits on an inmate's placement in administrative detention.[5] Instead, the warden is merely required to release the inmate "when reasons for placement cease to exist." *Id*.

        a.    **Defendants substantially complied with the rules and regulations governing the review of an inmate's confinement in administrative detention.**

According to defendants, the BOP placed Petrucelli in administrative detention upon his arrival at the MDC because the FBI classified him as high security based on the

---

[4]      BOP Program Statement 5270.07, effective September 4, 1996, implements the BOP regulations on the placement of inmates for both non-punitive administrative detention and punitive disciplinary detention. P.S. 5270.07 Ch. 9.

[5]      In the case of an inmate who completes disciplinary detention in the SHU but is kept in the SHU under administrative detention, the P.S. 5270.07 requires prison staff to return the inmate to the general population within 90 days or request regional-level assistance in transferring the

death-penalty-eligible charges he faced. The MDC staff prepared and delivered a copy of the administrative detention order to Petrucelli within 24 hours of his SHU placement. As previously discussed in § III.B.1 *supra*, however, the reason set forth in the administrative detention order, that Petrucelli was being held for a violation of a prison regulation and awaiting the captain's review, was not sufficiently detailed to give him reasonable notice as to why he was held in the SHU. Although Captain LoPresti did hold his first formal review of the case within three days of Petrucelli's placement in the SHU, he did not provide a copy of the special housing review form to the inmate as is required under 28 C.F.R. § 541.22(c) and P.S. 5270.07, Ch. 9, Pg. 8A, ¶ 1.c.(1). These inadequacies on the part of the MDC staff in following the BOP procedures no doubt contributed to plaintiff's confusion about confinement and prompted the trial court to hold a conference on the matter. Theses circumstances also led this court to find that plaintiff timely filed both his initial request for an administrative remedy and his initial complaint.

Nevertheless, LoPresti remedied his earlier mistake by providing every subsequent monthly special housing review form to Petrucelli. Defendants provided a complete documentary record of every weekly record review and monthly formal review of Petrucelli's administrative detention status up to the time of his release to the general population, as well as the monthly psychiatric reports. The special housing review forms indicate that Petrucelli was being held in the SHU because he was a facing a charge punishable by the death penalty. Once this reason ceased to exist, Petrucelli was released into the general population. Petrucelli has not directly challenged the documentary record supporting defendants' Rule 56.1 statements. In his self-styled 56.1 counterstatements, he claims he never appeared before Captain LoPresti for a formal review. (Pl.'s Decl. ¶ 1.) This self-serving claim cannot rebut the validity of defendants' special housing

inmate to a more suitable institution. P.S. 5270.07, Ch. 9, Pg. 7, ¶ 1.a.(6)(a)(i).

review record showing monthly formal reviews. *See Dixon v. Zenk*, No. 05-cv-3127 (JG), 2008 WL 2437841, at *6 (E.D.N.Y. July 16, 2008) (*pro se* prisoner plaintiff failed in his attempt to create a genuine issue of material fact by asserting that the prison's documents were falsified because he did not present any evidence that "casts a shadow on the veracity of defendant's submissions."). Petrucelli's conclusory factual claim also contradicts his second amended complaint in which he acknowledges having a formal review by Captain LoPresti on February 8, 2002 and objected to LoPresti's decision to keep him in the SHU. (Second Am. Compl. ¶ 6.)

Petrucelli also claims that, despite monthly psychiatric reports noting otherwise, he was never interviewed by a psychologist. (Pl. Decl. ¶ 4.) He does admit that the psychologists asked him through his SHU door whether he had feelings of self-mutilations. (*Id.*) Whether the questioning through the glass in the door satisfies the "personal interview" requirement as set forth in the regulations, the court need not address in order to resolve his due process claim.[6] Rather,

---

[6]    Prison regulations do not automatically create constitutionally protected liberty interests for prison inmates. *See e.g.*, *Sandin v. Conner*, 515 U.S. 472, 480-81 (1995) (emphasizing that the focus of a liberty-interest inquiry should be the nature of the actual deprivation or restraint as opposed to privileges conferred upon prison inmates by the mandatory language of the prison regulations). Here, the main thrust of Petrucelli's claim is the alleged failure of defendants to follow a regulatory process designed to keep inmates from being unnecessarily confined in administrative detention. The requirement that inmates in administrative detention be interviewed in person by prison psychologists confers a privilege but does not directly affect the deprivation of a liberty, and in light of the Supreme Court's emphasis in *Sandin*, does not give rise to a constitutionally protected liberty interest.

Even when a prison regulation is recognized as giving rise to a constitutionally protected liberty interest for prison inmates, the regulation does not itself determine the amount of process due to the inmate under the Constitution. *Tellier v. Scott*, No. 94-CV-3459 (KMW), 2004 WL 224499, at *5 (S.D.N.Y. Feb. 5, 2004). Thus, even if 28 C.F.R. § 542.22(c) confers a constitutionally-recognized liberty interest for him to have monthly psychological interviews as a condition for his confinement in administrative detention, it does not imply, for due process purposes, that the interview must be on the same side of the glass. *See Dixon*, 2008 WL 2437841 at *6 (declining to decide whether the MDC must conduct "personal interview" of inmates in administrative detention on the same side of the cell door) and *United States v. McTier*, No. 05 CR 401(ILG), 2006 WL 2707622, at *6 (E.D.N.Y. July 20, 2006) (finding no definitive definition of

"[d]ue process requires that [Petrucelli] receive notice of the reasons for his placement in the SHU and that he be provided with an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation (in writing or otherwise) . . . [and] that prison officials engage in periodic reviews of the continuing appropriateness of confinement in administrative detention."  *Dixon*, 2008 WL 2437841 at *6 (citations and internal quotation marks omitted).

Defendants, having conducted 31 reviews and seven psychological reviews of Petrucelli during his six-month stay in the SHU, have substantially complied with the BOP regulations governing the treatment of inmates in administrative detention, and provided him with the process that he is due.  His self-serving claims that he never had a hearing or psychological interview are not supported by any factual showing and are belied by his other statements.  They do not create any genuine issue of material fact for trial.  Even if his contention that he never had the required hearings is somehow true, defendants would still be entitled to qualified immunity on the due process claim.

## b. Defendants have qualified immunity on the procedural due process claim.

A defendant is "entitled to qualified immunity if either (1) his actions did not violate clearly established law or (2) it was objectively unreasonable for him to believe that his actions did not violate clearly established law."  *Iqbal*, 490 F.3d at 152.  The determination of qualified immunity involves a two-step process.  The district court must determine whether the alleged facts

_____

what satisfies the "hearing" requirement of § 541.22(c), refraining from deciding whether the requirement would be satisfied by a "hearing" held behind the glass of the inmate's SHU cell, and cautioning against "automatically apply[ing the meaning of hearings] designed for free citizens in an open society" to the context of prisons) (internal citations omitted).

demonstrate that the defendant violated a constitutional right, and if so, whether the right was clearly established at the time of the alleged violation—that is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

In 2001, the Second Circuit recognized that pretrial inmates had a constitutionally protected liberty interest not to suffer deprivation by administrative detention absent specified predicates. *Tellier v. Fields*, 280 F.3d 69, 81 (2d Cir. 2001). This liberty interest arises from the procedures set forth in 28 C.F.R. § 541.22. Tellier was a federal inmate already serving a state sentence but awaiting trial on federal charges, and held in administrative detention for 514 days because he posed a risk of escape. The inmate claimed that he never received his administrative detention order and never had any of the required in-person formal reviews. He specifically alleged that the special housing review forms provided by the defendants were falsified. The Second Circuit held that the warden's initial decision to place an inmate was discretionary so long as the listed predicates were satisfied, but rejected the BOP's argument that the status review requirements were meant to merely monitor inmates in administrative detention. *Id.* at 81-82. The court found, instead, that the reviews were designed to ensure that inmates were not held in administrative detention longer than necessary, but would be released as soon as the reason for the SHU confinement ceased to exist. Hence, the regulation created a liberty interest against unnecessary confinement. *Id* at 83.

The defendants in *Tellier* claimed qualified immunity, but the Circuit found it unreasonable for prison officials to believe that they could lawfully confine an inmate for 514 days in pretrial administrative detention without a hearing. *Id.* at 85 ("Had [they] confined Tellier for a brief period without a required hearing, we might be inclined to agree that no objectively

reasonable officer could have known that such a minor infraction constituted a violation of Tellier's constitutional rights."). The *Tellier* court cited instances of SHU confinements from three days to ten months as examples of "relatively brief periods" of confinement without a hearing. *Id.*

The Second Circuit reinforced this point in 2007 in *Iqbal v. Hasty*, by holding that pretrial detainees have a liberty interest protected by procedural due process in avoiding more than six months of administrative detention in the SHU. 490 F.3d at 163. Iqbal spent almost seven months in pretrial administrative detention in 2001 and alleged that he did not receive the required reviews from the MDC, which relied on the FBI's high security designation of his status, to hold him in solitary confinement. *Id.* at 160. The Second Circuit agreed with Iqbal that he had adequately pleaded a violation of his procedural due process right, but nonetheless dismissed the claim on qualified immunity grounds, finding that the defendant prison officials could not have known after *Tellier* that failing to hold required hearings during a "relatively brief" SHU confinement of about six months would violate the inmate's constitutional rights. *Id.* at 167 (explaining that Iqbal's procedural due process right "was not clearly established with the level of specificity that is required to defeat a qualified immunity defense.").

In this case, Petrucelli's confinement occurred in early 2002, after *Tellier* was decided but well before *Iqbal*. At that time, according to *Tellier*, prison officials were on notice that a 514-day detention without a hearing was clearly unreasonable, but not a "relatively brief" SHU confinement of six months or less. Petrucelli's confinement in the SHU lasted only six months. Even if the court were to somehow infer that defendants failed to conduct any formal review of his status in the SHU during those six months, which it cannot, defendants would still be entitled to qualified immunity in this case because of a "lack of clarity in prior case law." *Iqbal*, 490 F.3d at 167. Moreover, as discussed in Section C.1.a., *supra*, defendants substantially complied with the

rules and regulations governing the review of an inmate's confinement in administrative detention.

### 2. Substantive Due Process and Conditions of Confinement

"It is well settled that so long as pretrial detention is administrative rather that punitive, it is constitutional." *United States v. El-Hage*, 213 F.3d 74, 79 (2d Cir. 2000) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-40 (1979)). "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and . . . [would not have been] experienced [by a pretrial detainee] had he been released while awaiting trial." *Bell v. Wolfish*, 441 U.S. 520, 540 (1979). Whether a particular restriction accompanying pretrial detention amounts to punishment in the constitutional sense of the word can turn on a number of factors including:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play on a finding of *scienter*, . . . whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose.

*Wolfish*, 441 U.S. at 538 (1979) (citation omitted). Under 28 C.F.R. § 541.22(a)(3), the warden has the discretion to "place an inmate in administrative detention when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution and when the inmate is . . . pending investigation or trial for a criminal act."

In the present case, Petrucelli claims that restricting him to the SHU instead of the general population was arbitrary, and that such a restriction was constitutionally excessive under the Fifth Amendment. (Pl.'s Mem. at 16-17.) Defendants contend that he was placed in administrative detention on account of his high security classification by the FBI, the possibility that he would face the death penalty, and the warden's long experience in managing correctional facilities. The

implication is that Petrucelli, as an inmate facing a capital charge, could pose a danger to the prison facility, and his isolation from the general population would further the warden's penological objective in maintaining prison security. For a time during his criminal prosecution, the government did contemplate whether to seek the death penalty and Petrucelli was assigned an attorney with greater expertise with capital cases. (*See* Pl.'s Criminal Docket Entry No. 8, court order dated Mar. 14, 2002 granting request pursuant to 18 U.S.C. § 3005 for assignment of counsel "learned in the law applicable to capital cases."). As soon as defendants learned that the government was not seeking the death penalty, they released him from the SHU into the general population. Other courts in this district have upheld the placement of certain inmates awaiting trial on death penalty charges in administrative detention for as long as eighteen months. *See Dixon*, 2008 WL 2437841 at *6 (upholding the 18 months of pretrial administrative detention for an inmate charged with a death-penalty-eligible offense); *see also McTier*, 2006 WL 2707622 at *1 (declining to release inmates awaiting trial for death-penalty-eligible charges from administrative detention). Overall, the facts show that Petrucelli's placement in the SHU was not arbitrary but reasonably related to a legitimate penological objective of maintaining prison security.

As to whether Petrucelli's detention in the SHU was punitive rather than administrative, the court finds that it was administrative because the Warden's decision is entitled to significant deference. While the court is somewhat troubled by the lack of justification for the FBI's determination that plaintiff posed a high security risk and the conclusory nature of the Warden's determination, the plaintiff was charged with murder as an aid to racketeering, a continuing criminal offense, for which he could have received the death penalty. This had the potential of rendering him a person who would have little to lose by not following prison regulations.

Since "[p]retrial detainees have not been convicted of a crime and thus may not be

punished in any manner, . . . courts considering challenges to confinement brought by pretrial detainees must first consider whether the circumstances of the particular confinement render the confinement punitive." *Iqbal*, 490 F.3d at 168. An inference of the defendants' intent behind administrative detention may be drawn from the nature of the inmate's restraints. Petrucelli alleges that he was denied any meaningful human contact, but acknowledges speaking with Ortiz about his SHU confinement and being questioned by psychologists. He claims that he was allowed only one telephone call per week, had no property other than used underwear and other personal clothing items, was housed in a "freezing cold" cell, had isolated visits on a top floor with no vending machines, was locked in solitary confinement for twenty-three hours a day, and was only allowed to use the outdated law library twice. Although a detainee has an understandable desire to be as comfortable as possible during his confinement, this desire to be free from discomfort simply does not rise to the level of a fundamental liberty interest. *See Wolfish*, 441 U.S. at 534. A pretrial detainee's right to be free from punishment prior to an adjudication of guilt in accordance with the due process of law does not preclude prison officials from imposing significant restrictions.

Prison security and discipline are "essential goals that may require limitation or retraction of retained constitutional rights of both convicted prisoners and pretrial detainees." *Wolfish*, 441 U.S. at 546. Prison regulations give the prison officials the discretion, for example, to restrict for reasons of security, fire safety, or housekeeping, the amount of personal property that an inmate may retain while in administration. 28 C.F.R. § 541.23. Most notably, in Petrucelli's experience, there is a complete absence of any malicious, degrading, and humiliating treatment that would give to rise to a clear inference of punitive intent on the part of defendants. *See*, *e.g.*, *Elmaghraby v. Ashcroft*, No. 04-CV-01809 (JG)(SMG), 2005 WL 2375202, at *16 (E.D.N.Y. Sept. 27, 2005) (finding that the "purposeless and abusive" strip and body-cavity searches as well as verbal and

physical abuse gave rise to an inference that the confinement was punitive).

The alternative to administrative detention would have been to place in Petrucelli in the general population from the outset. In deciding between such alternatives, prison administrators are entitled to "wide-ranging deference in the . . . execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Wolfish*, 441 U.S. at 547. The Supreme Court, in *Helms v. Hewitt*, described the difficulty of anticipating risks as a reason for giving the warden this broad discretion when placing inmates in administrative detention:

> [A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators. In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se*, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context . . . turns largely on purely subjective evaluations and on predictions of future behavior [which] the administrators must predict not just one inmate's future actions, . . . but those of an entire institution. Owing to the central role of these types of intuitive judgments, a decision that an inmate or group of inmates represents a threat to the institution's security would not be appreciably fostered by [trial-type adversarial procedures].

459 U.S. 460, 474 (1983) *superseded on other grounds* (citations and internal quotation marks omitted). Given the deference to which the prison administrators are entitled, the lack of punitive intent on the part of defendants from the nature of Petrucelli's restrains, and the existence of a reasonable relation between the stated reason for his SHU confinement and a legitimate penological objective in this case, the court finds that there is no genuine issue of material fact as to whether his SHU confinement violated his substantive due-process right.

**IV.    Conclusion**

Petrucelli's *Bivens* claim is barred by the PLRA for failure to exhaust his administrative remedies.  Furthermore, Petrucelli failed to demonstrate a either a procedural or substantive due process violation by defendants.  Accordingly, defendants' motion to dismiss is granted in its entirety. A certificate of appealability shall not issue as petitioner has not made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253 (c)(2); Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Luciadore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).  The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for purpose of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

 SO ORDERED.

Dated: Brooklyn, New York
          March 25, 2009

_____
                        /s/
                 DORA L. IRIZARRY
                 United States District Judge